[L.A. No. 29818. In Bank. Feb. 3, 1972.]

CORNELL RIDLEY, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

## Counsel

Benjamin N. Wyatt, Jr., for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

## Opinion

**THE COURT.**—The Disciplinary Board of the State Bar has unanimously recommended that petitioner Cornell Ridley be disbarred, and he seeks in this proceeding to review the board's recommendation.

Petitioner was admitted to practice in 1954. The only disciplinary action previously taken against him was a private reproval in 1965. On the basis of extensive evidence received at hearings before a local administrative committee in Los Angeles, the board found that between 1961 and 1968 petitioner had been guilty of professional misconduct in 10 matters.

In four cases, the board found, petitioner promised to perform legal services for clients, accepted fees for the performance of these services, but failed to carry out his promises or to return the fees. In one situation an action was dismissed due to petitioner's failure to pursue the matter, and in another he failed to file a complaint before the statute of limitations had elapsed. It was also found that he had withheld payment of a client's funds, assisted an unauthorized person to practice law, concealed assets from creditors, and practiced law with knowledge that he was suspended from practice. In addition, the board found that on many occasions petitioner had made false statements to his clients as well as to committees of the State Bar investigating the complaints of clients against him.

*Failure to Perform Services or Return Fees*[1]

I. On March 8, 1965, Harry Merritt retained petitioner to obtain a

---

[1]The general pattern followed in the recitation of the facts will be to state the board's findings and the evidentiary matters and argument adduced in support of its action first, followed by evidence and contentions urged by petitioner.

"default out of county divorce," paying a fee of $283. Petitioner filed a complaint on Merritt's behalf in April, and an answer was filed by Merritt's wife. Originally the amount of child support payments to be made by Merritt was in dispute between the parties, but they finally agreed between themselves as to the sum of such payments. After the agreement was reached, Merritt instructed petitioner to obtain a default divorce, but petitioner refused to answer Merritt's telephone calls and correspondence, refused to obtain the divorce in accordance with his agreement, and refused to return any of the fee paid to him by Merritt.

Merritt testified that he grew weary of all the time and trouble, felt he "wasn't getting any place," and his wife went to Nevada, established residence for six weeks, and obtained the divorce.

Petitioner claimed that Merritt had asked if it would be agreeable with petitioner if the Merritts obtained other counsel for the divorce. Petitioner could not remember whether he took any further action on the Merritt matter, and could not find his office file in the case.[2] He now claims that he was at all times ready and willing to proceed in Merritt's behalf but was never instructed to do so by his client. He also states that he sent Mrs. Merritt some papers to sign regarding increased child support payments, but that she had not returned the papers to him. According to the State Bar this claim is made for the first time before this court.

II. On May 25, 1965, Gladston Belnavis, a television repairman, retained petitioner to represent him in securing a divorce. He paid petitioner a $105 retainer, and a few days later petitioner filed a complaint for annulment. Petitioner appeared in court on August 23, 1965, and moved for a 15-day extension to file an amended complaint. Belnavis paid petitioner another $50 in September 1965. Petitioner falsely represented to Belnavis that he had filed an amended complaint within the 15-day period. In fact, no amendment was filed until March 1967. Petitioner also falsely told Belnavis that the divorce was final and that Belnavis would receive a paper to that effect shortly. Ultimately, Belnavis discovered that a divorce had not been obtained, and he secured another attorney. Petitioner performed no further services for Belnavis and he wilfully failed and refused to refund the fee Belnavis had paid him.

---

[2]Petitioner could produce none of his files relating to the matters under investigation. He testified that he could not find his file in four of the cases, that he had established no file in two others, and that in two cases he had transferred his file to other attorneys who ultimately handled those matters and he had not himself kept copies. Petitioner's noncurrent files were in storage at the time of the hearings before the administrative committee, but he asserted he did not know where they were stored.

The Belnavis matter was under investigation by the State Bar and, on December 12, 1966, petitioner wrote the State Bar that Belnavis had not paid the fee and had not paid petitioner the amount required to file the amended complaint.

Petitioner claimed that Belnavis had decided his wife would obtain the divorce. He explained his failure to return the fee as follows: Belnavis was paid $250 by petitioner to fix some television sets. The work was not satisfactory, and petitioner had informed Belnavis that he would return some of the fee if Belnavis accomplished the repairs. Belnavis testified that he fixed two or three television sets for petitioner, but stated that petitioner paid him in cash for the work and no controversy developed over the matter.

III. On August 25, 1966, Mrs. Gilda R. Roberson retained petitioner to represent her in a divorce action filed against her by her husband, who also sought custody of their child. She paid him an $82 retainer to represent her in these proceedings. On September 2, 1966, a default was taken against Mrs. Roberson in her husband's action. She attempted many times to contact petitioner by telephone or by mail, but he refused to communicate with her, to appear on her behalf, or to perform any services for her. On February 7, 1967, different counsel was substituted for petitioner, and the new attorney ultimately succeeded in obtaining an order awarding custody of the child to Mrs. Roberson, but was not able to have the default divorce set aside.

Some time after the default was entered Mrs. Roberson met petitioner at a nightclub. Petitioner asserted on that occasion that Mrs. Roberson owed him $150 for representation in a prior criminal matter and he stated at the hearing that it was agreed he could keep the $82 retainer paid him in the divorce proceeding for his efforts on Mrs. Roberson's behalf in the criminal case. Mrs. Roberson denied that petitioner had ever performed any legal services for her. Petitioner claims that he did not proceed with Mrs. Roberson's representation because she told him she intended to employ another attorney. She denied making such a statement and testified that she had told petitioner she would retain another attorney if he did not wish to represent her and that petitioner had replied, "No. Everything is all right."

IV. On October 1, 1966, petitioner was retained by Mr. and Mrs. Donald Bisson to file a bankruptcy proceeding, and they paid him a $350 retainer fee. The Bissons tried repeatedly to reach petitioner thereafter, leaving messages at his home, his office, and his answering service, but petitioner refused to return their calls. Finally, they engaged another attorney to file for bankruptcy. The trustee in bankruptcy attempted to collect the

$350 fee paid to petitioner, who returned $100 of that amount on February 8, 1967, and promised that the balance would be paid within 30 days. The trustee again demanded payment on April 7, 1967. Petitioner did not reply to this demand, and has not paid the remaining $250.

The Bissons complained to the State Bar, and petitioner made various representations to the committee investigating the matter. On December 12, 1966, petitioner wrote the State Bar that he had not filed the bankruptcy proceedings for the Bissons because there were some outstanding checks written by Mr. Bisson for which there were insufficient funds. The State Bar asserts that petitioner's excuse for failing to file the petition is spurious and that the outstanding checks had no effect on the bankruptcy filing. In fact, the bankruptcy had been filed by the attorney engaged by the Bissons about a week before petitioner represented to the committee that his failure to file was due to the existence of these outstanding checks.

Petitioner falsely represented to the investigating committee that he had made arrangements to pay the $250 he owed the Bissons within six months. He also told the investigating committee that he had been dealing with a Mr. Ward at the Home Savings and Loan Association for the purpose of obtaining a loan on his home to repay the $250. However, no loan application was on file on petitioner's behalf with Home Savings and Loan Association and, on the contrary, petitioner was in default under an existing loan to that institution. In fact, at the time petitioner told the committee he was negotiating for a loan the lending company was in the process of seeking a writ of possession against petitioner's home because of his default on the existing loan, and the property had already been purchased at a trustee's sale.

Petitioner claimed in his testimony before the administrative committee that he had completed a loan application prior to his representation to the State Bar investigating committee and had given it to one John W. Perry to file, and that Perry had told petitioner the application had been submitted to Home Savings and Loan Association. He also testified to several telephone conversations with a Mr. Ward at the lending company in which, petitioner asserted, Ward gave him to understand that he would receive additional money on his home by refinancing or through a second deed of trust. Ward denied any dealings with petitioner regarding the possibility that petitioner might obtain a loan from the company.

*Failure to File or Prosecute Actions for Clients*

I. On July 21, 1961, Zola Mae Goff retained petitioner for the purpose of filing a malpractice suit against a Dr. Saxon. She paid him $15 of a $50 retainer, and executed a contingency fee agreement. Petitioner filed a

complaint on her behalf on June 18, 1962, and Mrs. Goff furnished him with medical reports and documentary evidence relating to the litigation. For more than two years Mrs. Goff was unable to contact petitioner despite numerous attempts to do so, because he refused to return her telephone calls. On June 23, 1966, the action was dismissed by the trial court.

In March 1965 petitioner represented to a State Bar investigating committee by letter and testimony that he had associated Samuel S. Brody to try Mrs. Goff's action and on December 12, 1966, he informed the State Bar that he had sent her file to Brody. He testified at the hearing before the administrative committee that he had sent the file to Brody before March 1966. The board found that no documentary evidence in the case was delivered to Brody prior to March 1967 (by which time the case had been dismissed), that all of petitioner's representations to Mrs. Goff and the committee were untrue and were knowingly made with the intent of misleading Mrs. Goff and the committee.[3]

According to the evidence, petitioner did not oppose the motion to dismiss, never made a demand for settlement, and told opposing counsel that he was attempting to convince his client that the case should be dismissed, although no such discussion with his client occurred.

At the hearing before the administrative committee, petitioner claimed that he had associated Brody on the Goff case in March or April 1965, and that it was petitioner's understanding that he was to do nothing more in the matter. He claims that he sent Mrs. Goff's file to Brody before July 11, 1966, and that he had not received four letters written by persons in Brody's office between July and October 1966, requesting the file. Petitioner stated that he "may" have received the notice of motion to dismiss the case in June 1966, but didn't recall receiving the ruling on the motion. Petitioner points out that Dr. Saxon's attorney testified that he had a discussion with some person in Brody's office in which Dr. Saxon's attorney asserted that he would not settle the case. Petitioner states this testimony indicates that the Goff matter had been referred to Brody's office prior to dismissal since it would be unlikely that

---

[3]Mr. Brody was deceased at the time of the administrative committee's hearing. His secretary and a former associate testified that they attempted to obtain Mrs. Goff's file from petitioner between July and October 1966 (after the case had been dismissed) and that the file was not delivered until after October 11, 1966. The file did not indicate the fact of dismissal. Mrs. Goff did not know until as late as November 3, 1966, that her case had been dismissed and, in fact, she first learned of the matter at a State Bar hearing. Long after the dismissal petitioner wrote the State Bar that he "thought" Brody had the file, that Brody was helping him, and that he would do everything possible to help Mrs. Goff.

Dr. Saxon's attorney would discuss the question of settlement after the case had been dismissed.

II. Prior to October 21, 1965, petitioner was retained to represent Wilbert J. Adams in a personal injury action. Adams delivered to petitioner medical reports and other documentation relating to his case. In November, petitioner told Adams that he had filed suit on Adams' behalf and had started negotiations with the defendant. He stated he would keep Adams informed of the progress of the negotiations. These representations were false and were made for the purpose of deceiving petitioner's client. Throughout 1966, Adams repeatedly attempted to contact petitioner by telephone and by mail, but petitioner refused to reply to these communications, and he permitted the statute of limitations to lapse without taking any action whatever on Adams' behalf.

Petitioner testified at the hearing before the administrative committee that there was a medical problem involved in Adams' case, that he thought the complaint had been filed, and that he had offered to make Adams whole when he discovered that no complaint was filed and the statute of limitations had lapsed. Adams denied that petitioner had offered to settle with him. Petitioner did not make any payments to Adams.

*Withholding Payments of Client's Funds*

On January 14, 1967, Carlton K. Hillman was arrested by the Los Angeles Police Department and $203 in cash was taken from him by the police. Three days later, Hillman was released from custody, and no charges were filed against him. The day of the release, by authorization of Hillman, petitioner obtained the $203 from the police. Hillman tried to contact petitioner for the return of the money but was unable to do so. Petitioner wrongfully withheld payment of the $203.

Hillman complained to the State Bar, and at a hearing before an investigating committee, petitioner's attorney represented that the money was retained by petitioner under an agreement with Hillman. The attorney stated that petitioner would provide the committee with a copy of the agreement, but no such document has been produced.

Petitioner claimed that Hillman had agreed he could keep the $203 as his fee for legal services performed on Hillman's behalf. Petitioner stated that he spoke with the police, the Hillman family and others about Hillman's case over a period of a day and a half, and that Hillman never made a demand upon him for the return of the money. Hillman's whereabouts were unknown at the time of the hearing.

*Aiding an Unlicensed Person to Practice Law*

On September 6, 1967, J. W. Perry, with defendant's knowledge and authorization, advised Mrs. Helen M. Price as to her legal rights and duties with regard to a claim against a moving and storage company and an insurance company. Perry consulted with Mrs. Price at petitioner's office. He advised that certain papers be filed in a municipal court action, and on September 7, 1967, a document was filed in the Los Angeles Municipal Court purporting to be a declaration of Mrs. Price and purporting to contain petitioner's signature. In fact, Mrs. Price had merely signed a verification blank and petitioner had not signed the document at all. Perry received $124.50 from Mrs. Price for costs and fees. Later Mrs. Price demanded that petitioner give her a receipt for the money she had paid to Perry and an accounting therefor, but petitioner failed to comply with either of these demands. Perry was not an attorney.

It was shown at the administrative committee hearing that Perry had agreed to file two lawsuits for Mrs. Price, for which she had paid him $59.50. She could not reach petitioner although she made numerous attempts to do so by telephone and by mail. Finally, petitioner telephoned Mrs. Price and told her that Perry was an attorney consultant. He admitted that he employed Perry to handle his office when he was away. Petitioner promised to return the $59.50 to Mrs. Price, but he did not do so.

Petitioner denied that he authorized Perry to accept money from clients or to counsel them, or to prepare or file any documents for Mrs. Price. He claimed that he did not know that Perry held himself out as a lawyer. Perry maintained an "attorney's consultant bureau" and, according to petitioner, he assisted petitioner in investigating cases and delivering documents. When Perry was working on matters for petitioner, he would use petitioner's office and would receive mail there. At the time Mrs. Price consulted Perry, he had a key to petitioner's office because petitioner was in the process of moving, and Perry was assisting him.

*Concealing Assets from Creditors*

Petitioner owed the United States Government $221.29 for income taxes, and a tax lien had been recorded for this amount in April 1963. In July of that year petitioner became the beneficial owner of a home in Los Angeles but he caused title to be taken in the name of Ernest Miller. The board concluded that title was placed in Miller's name for the purpose of concealing from petitioner's creditors the fact that he owned real property.

Petitioner testified that he had taken title to the property in Miller's name because "there were difficulties getting properties if you were

colored." At the hearing, the administrator for Miller's estate said that petitioner had told him that title was taken in Miller's name because petitioner "had a problem with the federal government somehow, tax authorities I believe he said, I am not precisely sure."

*Practicing Law During Suspension of License*

The final instance of misconduct found against petitioner is that he was suspended from the practice of law for a two-month period by this court (Dec. 7, 1967 to Feb. 8, 1968) for failure to pay his dues and that he wilfully engaged in the practice of law during this period, knowing that he was under suspension.

Petitioner testified in his defense that the failure to pay his dues was inadvertent, and that he had not received any of the notices of delinquency sent him by the State Bar or the notice of suspension issued by this court. Apparently petitioner failed to collect his office mail for extended periods of time. He claimed that he did not discover the fact of his suspension until February 1968, when he tried to pay his State Bar dues and "someone" called him and told him he had been suspended.

*Conclusion*

■ Since petitioner's credibility as a witness was in issue with regard to his conduct in the Merritt, Belnavis, Roberson and Bisson cases, we must give great weight to the action of the administrative committee which saw and heard the witnesses. (*Corn* v. *State Bar* (1968) 68 Cal.2d 461, 466-467 [67 Cal.Rptr. 401, 439 P.2d 313].) Petitioner's explanations of his conduct were based largely upon his own testimony and there was a marked absence of documentary corroboration in support of his assertions. Under the circumstances, we cannot say that he has met his burden of showing by convincing proof that the evidence does not support the findings of the board in the above matters.

The same conclusion is applicable to the board's finding that petitioner had failed to send Mrs. Goff's file to Samuel Brody's office until after the case had been dismissed, that he refused to contact Mrs. Goff with regard to the progress of her case or to proceed on her behalf, and that he made various misrepresentations to his client as well as committees of the State Bar about the Goff matter.

The evidence is uncontradicted in support of the board's finding that petitioner failed to file Adams' action until after the statute of limitations had lapsed. The board's findings that petitioner had misrepresented the status of Adams' case, repeatedly failed to answer Adams' communications, and wrongfully refused to perform any services for Adams, are clearly supported by the evidence.

The findings in the four remaining charges against petitioner depend largely upon inferences deducible from the evidence rather than upon conflicting evidence. We said in *Himmel* v. *State Bar,* 4 Cal.3d 786, 793-794 [94 Cal.Rptr. 825, 484 P.2d 993], that all reasonable doubts are to be resolved in favor of an accused attorney and if equally reasonable inferences may be drawn from a proven fact, the inference which leads to a conclusion of innocence rather than one leading to a conclusion of guilt will be accepted. Judged by these rules, there appear to be reasonable doubts as to the findings of the board regarding petitioner's attempt to conceal assets from his creditors and its finding that he knowingly practiced law while under suspension. The charges of withholding payment of a client's funds and aiding an unlicensed person to practice law are based upon a somewhat more solid foundation.

 We need not determine, however, whether as to these four charges a finding of innocence is equally consistent with the evidence as a finding of guilt, because the penalty of disbarment is clearly justified by petitioner's conduct in the Merritt, Belnavis, Roberson, Bisson, Goff, and Adams matters.

In *Grove* v. *State Bar* (1967) 66 Cal.2d 680 [58 Cal.Rptr. 564, 427 P.2d 164], an attorney was found guilty of offenses in 10 matters in which he refused to perform services for his clients and for which he had accepted fees. In addition, he had previously been suspended for the nonpayment of dues and was reprimanded for misleading a court as to the appearance of opposing counsel. We upheld the recommendation of disbarment stating, "In view of the number of offenses of which the board found petitioner guilty, and considering his previous record, we are compelled to conclude that he engaged in an habitual course of conduct toward his clients characterized by willful violation of his oath as an attorney. Although a few of his offenses, standing alone, might be described as merely negligent, or grossly negligent, his persistence in refusing to perform services for which he was engaged, and for which he accepted fees, can only be regarded as deliberate and willful. Petitioner habitually failed to file necessary documents for his clients, failed to appear at scheduled hearings, misled his clients as to the status of their affairs, and avoided communications by telephone, in writing, and in person.

"Habitual disregard by an attorney of the interests of clients is ground for disbarment under Business and Professions Code section 6103 and 6106. Even when such neglect is grossly negligent or careless, rather than willful and dishonest, it is an act of moral turpitude and professional misconduct, justifying disbarment." (66 Cal.2d at pp. 683-684.)

The same persistent disregard of an attorney's duty to his clients indi-

cated in *Grove* was shown by petitioner here. In addition, petitioner was found on numerous occasions to have deceived both his clients and various State Bar committees investigating the charges against him. He was previously suspended for nonpayment of dues, and was given a private reproval for his conduct in a case not involved in the present charges.

As grounds for mitigation of the punishment, petitioner asserts that he has made significant contributions to the community as an attorney, such as volunteer legal assistance during the Watts riots, chairmanship of the Legal Redress Committee of the National Association for the Advancement of Colored People, again as a volunteer, and as a participant in many other organizations and programs with commendable social goals. He states he was ill and was undergoing marital difficulties during the period his misconduct was found to have occurred. Yet, we point out, the misconduct found by the State Bar prevailed over a period of nearly seven years: 1961-1968.

There is ample evidence justifying the penalty of disbarment. We therefore order that the petitioner be disbarred from the practice of law and that his name be stricken from the roll of attorneys, effective 30 days after the filing of this opinion.