[L.A. No. 30230. In Bank. July 19, 1974.]

LENARD SAMPSON, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

Abe Richman for Petitioner.

Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

OPINION

**THE COURT.**—We review here the recommendation of the Disciplinary Board of the State Bar that petitioner Lenard Sampson be disbarred from the practice of law. Although we conclude that the disciplinary board's findings are, in large part, supported by the evidence, we conclude that the appropriate discipline should be probationary suspension for five years with actual suspension of two years.

These disciplinary proceedings were initiated in 1972, charging that petitioner knowingly submitted false claims to an insurance company, in violation of Insurance Code section 556,[1] and that petitioner breached standards of professional conduct in the settlement of clients' insurance claims. Petitioner generally denied the allegations against him. A hearing was conducted before Local Administrative Committee No. 48, Los Angeles County.

The state disciplinary board adopted in major part the findings of the local administrative committee. These findings show, as discussed more fully below, that petitioner knowingly filed false insurance claims on behalf of clients purportedly injured in traffic accidents. They also show that in the disposition of these claims, petitioner concluded settlement agreements and signed documents without the authorization of his clients. The disciplinary board also concurred in the local administrative committee's finding that petitioner knowingly submitted false evidence to the committee.

The local committee recommended that petitioner be suspended from the practice of law for a period of one year. The disciplinary board rejected this recommendation and instead adopted, by an eight to five margin (two

---

[1]Section 556 reads as follows: "It is unlawful to: [¶] (a) Present or cause to be presented any false or fraudulent claim for the payment of a loss under a contract of insurance. [¶] (b) Prepare, make, or subscribe any writing, with intent to present or use the same, or to allow it to be presented or used in support of any such claim. [¶] Every person who violates any provision of this section is punishable by imprisonment in the State prison not exceeding three years, or by fine not exceeding one thousand dollars, or by both."

members abstaining), a resolution recommending that petitioner be disbarred; the dissenting votes were recorded as opposed to the severity of the discipline.

Petitioner Sampson asks us to review both the findings and the discipline recommendation of the board. In the review of the findings, we are guided by well-settled principles which we briefly reiterate. ■ The evidence at the local administrative committee's hearing consisted primarily of conflicting testimony. The committee's opportunity to observe the demeanor of the witnesses constrains us to weigh heavily that testimony which supports the committee's findings. (*Ridley* v. *State Bar* (1972) 6 Cal.3d 551, 559 [99 Cal.Rptr. 873, 493 P.2d 105]; *Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 794 [94 Cal.Rptr. 825, 484 P.2d 993]; *Zitny* v. *State Bar* (1966) 64 Cal.2d 787, 789-790 [51 Cal.Rptr. 825, 415 P.2d 521].)

■ Although we independently review the findings (*Yokozeki* v. *State Bar* (1974) 11 Cal.3d 436, 443 [113 Cal.Rptr. 602, 521 P.2d 858]; *Schullman* v. *State Bar* (1973) 10 Cal.3d 526, 529 [111 Cal.Rptr. 161, 516 P.2d 865]; *Bernstein* v. *State Bar* (1972) 6 Cal.3d 909, 916 [101 Cal. Rptr. 369, 495 P.2d 1289]), petitioner must sustain the burden of showing that the disciplinary board's findings are erroneous. (Bus. & Prof. Code, § 6083, subd. (c); *Belli* v. *State Bar* (1974) 10 Cal.3d 824, 829 [112 Cal. Rptr. 527, 519 P.2d 575]; *Steiner* v. *State Bar* (1968) 68 Cal.2d 707, 708-709 [68 Cal.Rptr. 729, 441 P.2d 289].) ■ If, however, doubts remain that the charges against petitioner have been proven to a reasonable certainty, close questions will be resolved in petitioner's favor. (*Belli* v. *State Bar, supra,* 10 Cal.3d at p. 829; *Ashe* v. *State Bar* (1969) 71 Cal. 2d 123, 133 [77 Cal.Rptr. 233, 453 P.2d 737]; *Zitny* v. *State Bar, supra,* 64 Cal.2d at p. 790.) Thus, if the proven facts can reasonably support inferences both favorable and adverse to petitioner, "the inference leading to a conclusion of innocence rather than the one leading to a conclusion of guilt will be accepted." (*Zitny* v. *State Bar, supra,* 64 Cal.2d at p. 790; see also, *Himmel* v. *State Bar, supra,* 4 Cal.3d at p. 794; *Reznik* v. *State Bar* (1969) 1 Cal.3d 198, 202 [81 Cal.Rptr. 769, 460 P.2d 969, 40 A.L.R.3d 161].)

1. *The findings.*

The local administrative committee evaluated petitioner's conduct in the settlement of six personal injury claims arising out of two minor traffic accidents: one accident occurred in November 1969, the other in February 1970. The medical reports utilized to verify the claims arising from both accidents were transmitted to petitioner from the Adams-Crenshaw

Medical Center with the signature of Dr. Abe Schuchman. The medical center, which applied medical care to a large number and variety of patients, was operated, at the time of the incidents in question, by Dr. Schuchman in association with four other doctors. In addition to their professional relationship involving personal injury claimants, petitioner and Dr. Schuchman are close social friends. They have also cooperated in business ventures in the entertainment field.

A. *The Seide accident.*

In November 1969, a Cadillac driven by Joseph Seide was "side swiped" by another car; accompanying Seide at the time of the accident were two friends and occasional employees, Herbert Barris and Bruce Baron. Sometime thereafter, Seide contacted petitioner, a friend and business associate, to solicit advice in regard to recovery for damages allegedly sustained in the accident. In January 1970, petitioner sent a letter to Transnational Insurance Company demanding, pursuant to uninsured motorist coverage on the Cadillac, $2,550 on behalf of Seide, Barris and Baron ($850 each) because of injuries suffered in the accident. In support of these claims, petitioner attached reports issued by the Adams-Creshaw Medical Center and signed by Dr. Schuchman.

Petitioner's subsequent negotiations with Transnational yielded an agreement that each of the three claimants would receive $600 for settlement of his claim. Petitioner executed releases on behalf of the claimants and upon receipt·of the settlement drafts issued by Transnational, negotiated these drafts by signing both his and the claimant's name to them; petitioner wrote the claimants' signatures in a different manner than his own signature. After depositing these funds in his trust account, petitioner issued checks to Barris and Baron in the amount of $200 and credited to himself the sum of $330 which he had previously advanced to Seide as the settlement amount which he would receive.[2]

After petitioner's receipt of Transnational's drafts but before checks were issued to Barris and Baron, a strident argument ensued between petitioner and Seide over the settlement negotiated with Transnational. According to Seide, the argument developed because petitioner refused to correct the settlement after being informed that none of the three was

---

[2]The checks issued to Barris and Baron now indicate that $200 for legal services and $200 for medical expenses were deducted from the $600 settlements; there was conflicting testimony as to whether these notations appeared on the checks when originally issued. The check used to advance the money to Seide shows that $200 was to be paid for medical services; petitioner testified that he did not charge legal fees to Seide because of their friendship.

treated at the medical center. Seide testified that he had not authorized petitioner's use of his signature and that he was concerned about the amount of the settlement because he felt the driver of the other car was unfairly being sued for $1,800. Petitioner's response, Seide testified, was evasive regarding the inclusion of Barris and Baron in the settlement and was vague in regard to the reason for reimbursements for legal and medical services. Seide testified that when he was unable to obtain petitioner's rectification of the settlement, he contacted the police. After an investigation, however, the district attorney refused to initiate prosecution against petitioner.

Petitioner, on the other hand, testified that Seide confronted him with a demand that petitioner give him (Seide) the $1,200 received from Transnational in settlement of the Barris and Baron claims. According to petitioner, Seide became enraged when petitioner refused and demanded that petitioner give him $25,000 or he would contact the police and claim that the settlement was fraudulent. Petitioner further testified that Seide buttressed his efforts to induce petitioner to pay him the $1,200 by claiming that he could persuade Barris and Baron to testify against petitioner. Dr. Schuchman corroborated petitioner's testimony which indicated that Seide attempted extortion; he testified that Seide made a similar demand of him for $25,000.

Petitioner initially challenges the disciplinary board's finding that the medical documents which he submitted to Transnational contained false information.[3] Seide, Baron and Barris uniformly denied that they had ever been treated for injuries suffered in the accident. Petitioner testified, however, that Seide informed him that the three had secured treatment at the medical center. In addition, Dr. Schuchman and several of his employees testified that Seide, Barris and Baron were in fact at the medical center on the day following the accident. Ms. Caballero, the administrator of the medical center's physical therapy department, also testified that she administered therapy treatments to the three on a number of other occasions in November 1969.

The local administrative committeee expressly refused to find that Seide,

---

[3]The disciplinary board's finding number 12 reads as follows: "The medical reports prepared by the Adams-Crenshaw Medical Center over the signature of Abe Schuchman, M.D., and submitted by [petitioner] to Transnational Insurance Company contained false information and alleged medical services to have been rendered which, in fact, had not been rendered. [Petitioner] at the time of submitting said reports to the insurance company knew that said reports contained such false information. The reports of x-rays and billings for x-rays were false and [petitioner] knew said reports and billings were false."

Barris or Baron had not been treated at the medical center.[4] Thus, the testimony óf these three witnesses is not a strong basis for evaluating the truth or falsity of the medical reports. Nevertheless, the documentary evidence evaluated by the committee demonstrates that, as determined by the local committee and the state board, certain items on the medical reports were false.

According to the medical reports, Seide, Barris and Baron received X-ray diagnosis for injuries to the neck and back. The medical center's X-ray log, which contained both the patient's name and the service provided him, purported to show that the three had been X-rayed on November 5. Other entries for that date and on surrounding pages, however, differ very markedly from those in question, both in style and in the type of ink used. This variation compels the conclusion that the entries for Seide, Barris and Baron were not entered into the log in the regular course of the clinic's operations.[5] Since neither petitioner nor Dr. Schuchman was able to present evidence explaining the evident alteration of the X-ray log, the board could properly conclude that the X-ray charges were fallacious. Further evidence that portions of the documents submitted to Transnational were false is discussed in the margin.[6]

[4]That portion of the local administrative committee's finding number 12 which was deleted by the disciplinary board read as follows: "The Committee does not find whether Messrs. Seide, Baron or Barris or any of them ever visited or treated with the Adams-Crenshaw Medical Center but does find . . ."

[5]We note some of the factors which support the conclusion that the entries for Seide, Barris and Baron were added after November 5. Although Dr. Schuchman's employees testified that the three entered the clinic together, the entries were not sequential. The entry for Bruce Baron appeared in the middle of the entries for November 5 while those for the other two were crowded at the bottom of the page; similar crowding was not observed on any other page. In addition, if Bruce Baron's name were not in the log, the patient listed prior to him would have been recorded as having received a sequence of three different X-ray positions. This three-position sequence was repeated a number of times on pages in proximity to the page for November 5. Conversely, the two positions which were recorded as prescribed for Baron did not occur on proximate pages; these two were always listed as part of a three-position sequence.

[6]The statement of services rendered indicated that the three received discharge examinations; their medical charts, however, merely noted that they were discharged. Ms. Caballero testified that although a discharge examination was a requirement of the center, many patients stopped treatment on their own initiative. If a patient ceased to visit the center, the patient's chart was terminated by a discharge notation. Thus, the charts fail to support the billing for a discharge examination.

According to the bills submitted to Transnational, the three occupants of the Seide vehicle were supplied cervical collars. Ms. Caballero testified that two of the three would have required specially ordered collars because of their size. Neither her testimony nor the medical charts indicate that such special medical appliances were provided.

Although conceding that the evidence may support the disciplinary board's conclusion that the documents submitted to Transnational included inflated medical expense figures, petitioner further argues that the State Bar has not sustained its burden of proving to a "reasonable certainty" (*Himmel* v. *State Bar, supra,* 4 Cal.3d at p. 794) that he knew the documents were false when he included them with the demand letter sent to Transnational. We believe, however, that the evidence adduced at the hearing is sufficient to conclude that the State Bar has met its burden of proof.

The testimony indicative of petitioner's knowledge at the time of submission was conflicting. Seide testified that he informed petitioner that none of the three occupants of the Cadillac was injured. In addition, he testified that when the other driver's lack of insurance coverage became apparent, petitioner told him that records could be "fixed" so that some recovery from the Cadillac's insurer could be garnered. Seide recalled that petitioner advised that all he need do was to tell his insurance company that he was injured in the accident. Petitioner, on the other hand, denied that he advised Seide that a recovery could be "fixed." He further testified that Seide informed him that he (Seide) and the others secured treatment for injuries related to the accident.

Although Seide's testimony directly supports the charge that petitioner knew of the falsity of medical reports, Seide's veracity is somewhat suspect in light of the committee's express failure to accept his assertion that he did not visit the medical center as a result of the accident. Moreover, the evident animosity between Seide and petitioner, acrimoniously expressed in the argument over the settlement monies, also cautions against ready acceptance of Seide's charge that petitioner participated in a scheme to procure a settlement from Transnational. **(4)** Testimony against a lawyer motivated by ill-will is evaluated with greater skepticism than testimony devoid of such motivation. (See *Hildebrand* v. *State Bar* (1941) 18 Cal.2d 816, 834 [117 P.2d 860].)

■ To establish that petitioner knew of the falsity of the submitted bills, however, circumstantial evidence as well as direct testimony may be considered. (*Zitny* v. *State Bar, supra,* 64 Cal.2d at p. 792; *Abeles* v. *State Bar* (1973) 9 Cal.3d 603, 610 [108 Cal.Rptr. 359, 510 P.2d 719].) The record in this case provides circumstantial support for the committee's conclusion that petitioner knew that the bills reflected services not actually rendered.

First, petitioner's admittedly close association with Dr. Schuchman and the latter's controlling position within the medical center provided an op-

portunity for the procurement of false documents. Second, petitioner's transactions with Transnational indicate a lack of candor on his part. Although petitioner signed releases on behalf of Seide, Barris and Baron without indicating thereon that he was signing in their behalf, petitioner included in the letter transmitting these documents to Transnational the assurance that the releases were "properly signed and executed by my clients. . . ."

Third, and perhaps most significantly, an inference that petitioner knew of the falsity of the documents is supported by petitioner's conduct in the later Martinez incident, discussed below. As we explain, there is substantial evidence in the Martinez matter that petitioner knowingly submitted false insurance claims issued by the Adams-Crenshaw Medical Center; his involvement there can properly be considered in evaluating the weight of the evidence as to his knowledge of the falsity of the Seide, Barris and Baron documents when he submitted them to the insurance company. (Evid. Code, § 1101, subd. (b); see *People* v. *Schader* (1969) 71 Cal.2d 761, 773-774 [80 Cal.Rptr. 1, 457 P.2d 841]; Witkin, Cal. Evidence (2d ed. 1966) § 341, p. 300.)

The record thus does contain both direct and circumstantial evidence supporting the disciplinary board's finding that petitioner knew of the falsity of medical records which he submitted to the insurance company. Consequently, we conclude that petitioner has not sustained his burden of proving the disciplinary board's findings erroneous. (Bus. & Prof. Code, § 6083, subd. (c).)

B. *The Martinez accident.*

Several days after his automobile was struck from the rear in a minor traffic accident, Ralph Martinez and his sister, Mary Paramo, retained petitioner as their representative for claims arising out of the accident. Martinez testified that when his sister informed petitioner that she had been injured in the accident, petitioner directed her to consult Dr. Schuchman for treatment of those injuries. Several months later, the Adams-Crenshaw Medical Center sent documents to petitioner which showed that Martinez and Paramo, along with Richard Cobarrobas, Jr., Ms. Paramo's son, who was an occupant of the car at the time of the accident, had been treated at the center for accident-related injuries. These documents, along with a statement of legal services rendered, were forwarded by petitioner to Allstate Insurance Company, the insurer of the automobile which struck the Martinez vehicle.

Without further contact with Martinez, Paramo or Cobarrobas, peti-

tioner negotiated a settlement of personal injury and property damage claims on their behalf. Upon receipt of the sum negotiated, petitioner contacted Martinez, and at a meeting which ensued, Martinez signed a release of further claims and the settlement draft issued by Allstate. According to Martinez, he also signed, at petitioner's instigation, similar documents on behalf of Paramo and Cobarrobas. Petitioner then issued checks drawn on his trust account in the amounts purportedly due the three occupants of the car after deduction of petitioner's fee and the amounts paid for medical treatment.

The disciplinary board found that petitioner knowingly submitted false claims to Allstate when he forwarded to Allstate the medical documents showing that Martinez and Cobarrobas were treated at the medical center. Petitioner concedes that neither Martinez nor Cobarrobas availed themselves of the medical center's facilities; petitioner contends, however, that the evidence does not support the finding that he knew of the documents' falsity when he submitted them. Petitioner testified that his first knowledge that something was amiss was the result of a telephone conversation with Dr. Schuchman almost a month after meeting with Martinez. Upon learning from the doctor that the medical center had no records to substantiate the billings issued in the names of Martinez and Cobarrobas, petitioner stopped payment on his checks payable to them and reimbursed Allstate for the amount of their settlements.

The record, however, contains substantial evidence to support the board's finding that petitioner did participate in a scheme to defraud Allstate; the most compelling and direct evidence in this regard is the testimony of Martinez and Paramo. Martinez testified that at the initial meeting with petitioner both he and Ms. Paramo told petitioner that only Ms. Paramo was injured. She corroborated this testimony at the committee's hearing. Martinez further testified that at the meeting at which petitioner issued his trust account checks, he (Martinez) expressed surprise at the notation on his check reflecting disbursement of a portion of the settlement money for medical expenses. He told petitioner that he had not been treated at the medical center. Martinez recalled that petitioner responded: "That is the way I got it fixed so you could get some money." In addition, Martinez testified that petitioner cautioned secrecy and offered to return the checks to the insurance company if Martinez did not want to accept them.

The only challenge offered to Martinez' testimony was petitioner's contradictory recollection. Petitioner testified that at his initial meeting with

Martinez and Paramo, they advised him that all three occupants of the car were injured in the accident but that they had been unable to secure medical care because they lacked resources to pay a doctor. Petitioner testified that he suggested they consult Dr. Schuchman because he did not require advance payments by patients injured in traffic accidents if insurance coverage could be verified. In regard to the meeting with Martinez, petitioner denied that Martinez registered surprise about deductions for medical expenses. In addition, petitioner testified that Martinez took Allstate's settlement drafts and unsigned releases with him and returned these documents, signed by Paramo and Caborrobas, either the same night or the next day. This version of the meeting with Martinez contradicted, however, the explanation of the Martinez matter which petitioner had previously filed with the State Bar.[7]

Dr. Schuchman, although specifically directed by the local administrative committee to unearth any evidence to explain the origin of the false billings, was unable to produce the requested showing; he maintained that the billings were merely an "error." The absence of evidence indicating the source of the false bills and the obvious degree to which the local administrative committee credited Martinez' testimony support the conclusion that petitioner knew that the documents were false when he submitted them to Allstate. We conclude that petitioner has not sustained his burden of proving the disciplinary board's findings erroneous.[8] (Bus. & Prof. Code, § 6083, subd. (c).)

---

[7]Petitioner's letter to the State Bar constituted his response to a complaint filed by Ms. Paramo that the settlement monies received by her were insufficient. Petitioner recited that he issued trust account checks to Martinez who questioned deductions for medical expenses because neither he nor Cobarrobas was treated. Petitioner stated that upon learning of this apparent mistake, he requested that Martinez return the trust account checks. Martinez allegedly refused, and petitioner stopped payment on them after learning from Dr. Schuchman of the absence of any records to substantiate the Martinez and Cobarrobas billings.

[8]Petitioner additionally argues that the rule that inferences leading to a conclusion of innocence will be drawn if reasonable (*Himmel* v. *State Bar, supra,* 4 Cal.3d at p. 794) compels the conclusion that the evidence does not sustain the findings in regard to the Martinez matter. He argues that since injuries sometimes manifest themselves weeks after an accident, the possibility exists that although he may have been informed at his initial meeting with Martinez and Paramo that only Ms. Paramo was injured, Martinez and Cobarrobas may have felt the necessity of seeing a doctor after that meeting. In light of this possibility, petitioner argues that merely submitting documents on behalf of clients who have not been injured at the time of their meeting with a lawyer cannot be the basis for concluding that the lawyer engaged in wrongful behavior. Petitioner's argument, however, ignores Martinez' testimony that petitioner was not surprised when informed that neither Martinez nor Cobarrobas had been treated.

### C. *Additional conduct warranting discipline.*

■ In addition to its finding that petitioner fraudulently submitted claims to insurance companies, the disciplinary board concluded that petitioner breached the strict standards of fair dealing and candor demanded of members of the legal profession in his handling of both the Seide and Martinez matters. Specifically, the disciplinary board adopted the local administrative committee's findings that petitioner (1) endorsed Transnational's checks without the authorization of his clients, (2) negotiated a settlement for Cobarrobas although not retained as his attorney, (3) concluded, without authorization, settlements on behalf of Paramo and Martinez, (4) accepted false acknowledgements by inducing Martinez to sign Paramo's and Cobarrobas' names to documents and (5) failed to secure his clients' authorization for the payment of funds to Dr. Schuchman.

Although petitioner disputes the sufficiency of the evidence to support some of these conclusions, in our view the direct testimony of Seide, Martinez and Paramo reviewed above provides adequate support for each of the subsidiary findings.[9] There can be little doubt that such breaches of an attorney's duty to his clients may properly be the subject of disciplinary action. (See, e.g., Rules of Professional Conduct, rule 9 [duty to account for disbursement of clients' funds]; *Bodisco* v. *State Bar* (1962) 58 Cal.2d 495 [24 Cal.Rptr. 835, 374 P.2d 803] [unauthorized settlement agreement]; *McKinney* v. *State Bar* (1964) 62 Cal.2d 194 [41 Cal.Rptr. 665, 397 P.2d 425]; *Hallinan* v. *State Bar* (1948) 33 Cal.2d 246 [200 P.2d 787].)

■ We agree, however, with petitioner's contention that there is insufficient evidence to support the board's additional finding that petitioner knowingly submitted false evidence to the local administrative committee by permitting the introduction of the falsified X-ray log. (See fn. 5 and accompanying text, *supra.*) Petitioner did not submit the X-ray log into evidence; instead the log was produced at the hearing pursuant to the committee's own request that Dr. Schuchman produce any evidence he could find. Although Dr. Schuchman testified that petitioner, in order to prepare for the disciplinary proceedings, had taken possession of some of the medi-

---

[9]Petitioner's principal argument on these subsidiary findings is that there is insufficient evidence to support the conclusion that he was not authorized to sign documents on behalf of Seide, Barris and Baron. Although at the hearing Seide specifically denied authorizing petitioner to sign documents on his behalf, petitioner claims that Seide was not a credible witness. The local committee, which heard the evidence and observed the demeanor of the witnesses, however, chose to credit Seide's testimony on this point and in view of petitioner's own questionable veracity, we believe that the committee's finding should be upheld.

cal center's records, he did not specifically testify that petitioner ever had possession of, or even knew about, the X-ray log. Under these circumstances, a reasonable inference arises that petitioner did not know or participate in the submission of the false log to the committee. Because of the absence of any evidence in the record indicating that petitioner had possession or knowledge of the log, we believe that the finding of petitioner's participation in the submission of misleading evidence cannot be sustained.

## 2. *The discipline recommendation.*

Petitioner was admitted to the practice of law in June 1957, and, according to his testimony, he engages primarily in a criminal law practice. No prior disciplinary proceedings against petitioner appear on the record. He asks us to review the disbarment recommendation of the disciplinary board.

An attorney's knowing submission of false claims to an insurance company involves an act of dishonesty and moral turpitude within the meaning of Business and Professions Code section 6106 and is therefore a cause for discipline. In *Scofield* v. *State Bar* (1965) 62 Cal.2d 624 [43 Cal.Rptr. 825, 401 P.2d 217], the findings showed that Scofield submitted duplicate claims for special damages to insurance companies without revealing the duplication. We reduced the six months recommended suspension to 30 days. In *In re Benson* (1964) Bar Misc. 2693, an attorney convicted of conspiracy (Pen. Code, § 182, subds. 1 and 4) and insurance fraud (Ins. Code, § 556) was suspended for five years. Thus, the discipline recommended in the instant case is significantly greater than has been imposed in past cases of insurance fraud.

In addition to the insurance fraud charges, petitioner's conduct towards his clients was marked by numerous deviations from established standards; most serious was his failure to consult with Martinez or Paramo prior to concluding the settlement negotiations with Allstate. In *Bodisco* v. *State Bar, supra,* 58 Cal.2d 495, we considered the appropriate discipline for an attorney whose conduct paralleled petitioner's in certain regards. Bodisco concluded a settlement agreement and executed documents on behalf of his client; his negotiated settlement was less than the amount which the client had orally authorized. The discipline ordered was two years suspension and was based, in part, on Bodisco's commingling of funds and a prior disciplinary record (public reprimand).

The findings against petitioner evidence serious acts of misconduct which clearly warrant the imposition of a substantial sanction. Petitioner intro-

duced no evidence in mitigation and did not call witnesses to indicate his performance or reputation as an attorney.[10] Several factors, however, argue for imposition of a less severe discipline than the recommended disbarment.

In petitioner's favor is the absence of a prior disciplinary record and the apparent willingness of the local administrative committee to believe that a one-year suspension would prevent reoccurrence of misconduct. In addition, in recommending the ultimate sanction of disbarment, the disciplinary board may have weighed heavily the finding that petitioner submitted false information at the hearing. This finding tends to indicate continuing misconduct and the failure of petitioner to appreciate the importance of the charges against him. Because we have concluded that the record does not support the conclusion that petitioner submitted the false evidence or participated in the falsification of the X-ray log, we believe the harsh recommendation of disbarment is not warranted. We conclude that petitioner's discipline should be probationary suspension for five years, with two years actual suspension.

It is ordered that petitioner be suspended from the practice of law for a period of five years. Execution of such suspension is stayed for the period of five years, during which period he is placed on probation upon the following conditions: that he is suspended for the first two years and that, within 30 days after the effective date of this order, he shall perform the acts specified in rule 955, subdivision (a), California Rules of Court, and that within 60 days after the effective date of this order petitioner shall file with the clerk of this court, the affidavit provided for in subdivision (c) of the foregoing rule. This order is effective 30 days after the filing of this opinion.

---

[10]Petitioner's counsel before the disciplinary board sought to augment the record by further hearings pursuant to rule 85.1, Rules of Procedure of the State Bar. He argued that petitioner's representation by his father at the local administrative committee's hearing was ill-considered and resulted in an inadequate defense and the absence of testimony showing good character and reputation. The disciplinary board denied the request for the introduction of further evidence.