[L.A. No. 30339. In Bank. July 29, 1975.]

MITCHELL GEFFEN, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

Rich & Ezer and Mitchel J. Ezer for Petitioner.

Herbert M. Rosenthal and Stuart A. Forsyth for Respondent.

## OPINION

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar (board) that petitioner be suspended from the practice of law in this state for six months. Petitioner was admitted to practice law in 1962, and he has no prior record of discipline.

In a notice to show cause, petitioner was charged with soliciting professional employment, through an employee, Fred Lieberman, in two separate matters (Warwick and Tavernakis) in violation of rules 2 and 3 of the Rules of Professional Conduct (West's, Bus. & Prof. Code, foll.

§ 6076 [Deering's, Rules of Professional Conduct, rules 2, 3]).[1] A third count did not expressly charge that Lieberman had solicited professional employment from the prospective client there involved (Wright), but did charge that Lieberman contacted her and obtained her signature on petitioner's retainer agreement.

The local administrative committee unanimously found that petitioner's conduct with respect to the alleged solicitations (Warwick and Tavernakis) constituted a wilful violation of the rules, and recommended that petitioner be publicly reproved. The local administrative committee further found: "In the opinion of the Committee, [petitioner] has not shown, either before or after the proceedings before Special Local Administrative Committee No. 1 for the County of Los Angeles, due regard for his obligations and responsibilities under the California State Bar Act and the Rules of Professional Conduct insofar as they pertain to the question of solicitation of business. In his attitude before the Committee, as well as in his testimony itself, he has demonstrated, in the opinion of the Committee, that he has not taken seriously the charges against him."

Petitioner filed a conditional acceptance of the local administrative committee's recommendation, but the board unanimously rejected it and directed that a transcript of the proceedings before the committee be prepared. The board then unanimously adopted new findings of fact and recommended, by a vote of nine to four, that petitioner be suspended for six months. Three of the four dissenting members recommended a suspension of only three months.

The new findings of fact adopted by the board incorporated those of the local administrative committee and, in addition, findings that (1) petitioner knew of Lieberman's solicitations of Miss Warwick and Mrs. Tavernakis; (2) Lieberman contacted Mrs. Wright and solicited professional employment on behalf of petitioner pursuant to a common scheme or design; and (3) "Lieberman's activities were carried on with

---

[1]Rule 2 provides, in part: "A member of the State Bar shall not solicit professional employment by advertisement or otherwise.

"Without limiting the generality of the foregoing a member of the State Bar shall not solicit professional employment by (1) Volunteering counsel or advice except where ties of blood relationship or trust make it appropriate."

Rule 3 provides, in part: "A member of the State Bar shall not employ another to solicit or obtain, or remunerate another for soliciting or obtaining, professional employment for him . . . ."

[petitioner's] knowledge, acquiescence and consent, and pursuant to an established scheme or design."

Petitioner has been practicing in the Los Angeles area and since 1965 has been a member of the firm of Mizrahi & Geffen, which has offices on Wilshire Boulevard in Los Angeles and in Gardena. Mr. Mizrahi practiced from the Wilshire office, and petitioner practiced from Gardena. Petitioner handled many workmen's compensation, divorce, and criminal law matters and was out of the office a great deal. He apparently felt that because he was in his office for such brief periods of time each day and was unable to return promptly calls received in his absence, he was losing much potential law business.

In the latter part of 1969, the firm employed Frederick Lieberman on a part-time basis at $5 an hour to investigate accidents, take photographs, and perform related duties. Lieberman was then working as a salesman. He at first worked out of the Wilshire office under the supervision of Mizrahi, who gave him his initial instructions. Lieberman had taken some business law courses at college, but he was not a college graduate, had never before worked in accident investigation, and had never studied law.

A few months later, Lieberman was transferred to the Gardena office to assist petitioner and to perform the duties of office manager at a salary of $850 per month.[2] His instructions were "to return all calls for any attorneys that are out of the office." According to petitioner, the only reason Lieberman was put on a full-time basis was to take care of telephone calls.

Petitioner testified that he would take calls when he was in the office; that Lieberman would take them in petitioner's absence; and that if both he and Lieberman were out, one of the secretaries would enter the incoming calls on a "phone sheet," and Lieberman would return the calls later. Petitioner's instructions to the secretaries were to "write down the calls on the sheet." The secretaries would then list the name of the attorney called, the name and telephone number or address of the person to be called, and sometimes a message. No effort was made to show whether the person who placed the call to petitioner's office was the person to be called.

---

[2]By November 1971, Lieberman's salary had been increased to $1,300 per month; and at the time of the local administrative committee's hearing in May 1973 he was being paid $1,399 per month.

Lieberman tried to set up appointments with the prospective clients with whom he talked. When seeing a prospective client, he would have with him retainer agreement forms, medical authorization forms, and "fact sheets," on which he wrote certain pertinent information to be used by the attorneys in preparing the case.

*Warwick Solicitation*

The first count of the notice to show cause charged petitioner with soliciting, through Lieberman, Maralee Warwick, who had been involved in an automobile accident on April 22, 1970. The police were not called to the scene of the accident, but Miss Warwick reported the accident to her insurance carrier the next morning. She was taken to the Orthopaedic Hospital for X-rays the day after the accident occurred. She did not recall talking with anyone at the hospital except the doctor who attended her.

That evening she received a telephone call from Lieberman. She did not know either Lieberman or petitioner and had never heard of petitioner's law firm. She had an unlisted telephone number and she did not know how Lieberman had obtained it. Lieberman told her that he was an investigator for petitioner's law firm and understood she had been in an automobile accident. When Miss Warwick asked how he knew about it, he was rather vague but indicated that someone at the hospital may have told him. He suggested that Miss Warwick see a certain doctor, who, he said, would prescribe heat treatments, which were "fun." After Miss Warwick told Lieberman that she did not intend to see the doctor he recommended (she was covered by the Kaiser medical plan), Lieberman told her that she could make at least $1,000 after payment of her medical and legal fees; and he asked her to let him come out at once to have her sign a retainer agreement. She told him, however, that she would not sign anything without consulting someone.

Although Lieberman, when testifying, claimed he could not remember what he had said to Miss Warwick, he did admit that it was possible he had suggested that she retain petitioner's law firm. Two days after the accident, Lieberman called again to see if Miss Warwick would sign a retainer, but she refused. She heard nothing further from either Lieberman or petitioner's law firm.

*Wright Solicitation*   .

Mrs. Vinader Wright was injured in an automobile accident on May 7, 1970. She was taken to Orthopaedic Hospital by ambulance and was examined and X-rayed there. After going home she telephoned her insurance agent and left a message that she had been in an accident.

The next morning, Lieberman called at Mrs. Wright's home without having been asked to do so. Mrs. Wright assumed that the insurance agent (with whom she had not yet spoken) had sent him when he received her message. Lieberman asked her to sign certain papers allegedly necessary for an investigation. She did not have her glasses on and was unable to read the papers, but she signed anyway, since she thought that Lieberman had been sent by the insurance agent. Lieberman did not explain to her that by signing the papers she was retaining petitioner's law firm to represent her in connection with the accident, and he did not give her a copy of the retainer agreement.

The following day, Mrs. Wright received from petitioner's office a form letter thanking her for selecting the firm to represent her and giving her various instructions on steps to be taken. When she received this letter, she telephoned her insurance agent and learned that he had not sent Lieberman to see her. A few days later, Lieberman telephoned Mrs. Wright and informed her that he was employed by petitioner's law firm. She told him she did not want an attorney, and she later wrote a letter to the firm to that effect.

During Lieberman's visit to her home Mrs. Wright had mentioned that Dr. Kaufman was her personal physician. After Mrs. Wright notified petitioner's law firm that she did not want to be represented by an attorney at that time, Lieberman telephoned Dr. Kaufman. Mrs. Wright was in the doctor's office at that time, and the doctor had Mrs. Wright talk with Lieberman. She again told him that she did not then want the services of an attorney. She had no further contact with Lieberman or the firm.

A client's file was opened in Mrs. Wright's name, since petitioner considered that she had retained him. The file was not available at the time of the hearing, both Lieberman and petitioner testifying that it had probably been inadvertently destroyed as trash when the office had been remodeled. The remodeling occurred in 1972 after petitioner had been

notified that Mrs. Wright had filed a complaint against him with the State Bar.

*Tavernakis Solicitation*

On June 10, 1970, Margaret Elizabeth Tavernakis was injured in an automobile accident and was rendered unconscious for a short time. She was taken by ambulance to the Orthopaedic Hospital, where she was examined for broken bones, and her superficial cuts were cleansed. Mrs. Tavernakis felt groggy and disoriented while at the hospital and recalled chiefly the effort made to find someone to come for her. Finally, her estranged husband, James Tavernakis, came to the hospital and took her to Kaiser Hospital, where she had coverage. She had a brief conversation with him about what to do, and he told her that they would find a lawyer for her later. She discussed the possibility of employing an attorney with no one else.

Two days later Lieberman telephoned Mrs. Tavernakis while she was recuperating at home. He told her that he was "with the firm of Mizrahi & Geffen" and mentioned that he had learned of her accident from a client or former client who had seen her at the hospital. He asked her if she had employed an attorney; and when she indicated she had not, he urged her to do so promptly and recommended petitioner's law firm. Lieberman represented to her that the attorneys in petitioner's law firm "were specialists in automobile accidents" and that they were the best in the country. He also suggested to her the possibility that she may have known them while she was a student at UCLA, where they had both studied.

Mrs. Tavernakis said she wanted to discuss the matter with her husband before making a decision, and Lieberman gave her a Gardena telephone number to call after she made her decision. About half an hour later, Mrs. Tavernakis' telephone rang again, and an inquiry was made for another person. The caller, however, turned out to be Lieberman, who apparently recognized Mrs. Tavernakis' voice and indicated he had called her back by mistake. He then asked if she had had a conversation with her husband in the meantime. She informed him that she had not.

Later that morning, Mrs. Tavernakis told her husband about her conversations with Lieberman. Her husband then spoke with his sister-in-law, who recommended Milton Wasserman. At his suggestion,

Mrs. Tavernakis made an appointment with Dr. Levine. Her husband took her to the doctor's office. After they left, their car was rear-ended; Mrs. Tavernakis was again injured and was hospitalized for three days.

Arrangements were made for Wasserman to call on Mrs. Tavernakis at her home. Before he came, however, she received another telephone call from Lieberman, inquiring if she had employed an attorney and stressing the importance of immediate action. When Lieberman learned from Mrs. Tavernakis that she had been in another accident and that the second one was a rear-end collision, he suggested that she forget about the first accident, because it would be more difficult to recover for her injuries in that one, and concentrate on attempting to recover on the basis of the clear-cut liability for the rear-end collision. In spite of Lieberman's persistent attempts to set up an appointment with Mrs. Tavernakis to execute a retainer employing petitioner's firm, she did not agree to meet with him.

When Mrs. Tavernakis told Lieberman that she had a meeting arranged with Wasserman, Lieberman told her that he knew all the good personal injury attorneys and that he had never heard of Wasserman and thought he therefore probably was not a very good attorney.

At her meeting with Wasserman, Mrs. Tavernakis mentioned the calls from Lieberman. Wasserman felt the activity was unethical and urged her to call the State Bar and, in fact, offered to call the State Bar for her. He suggested, however, that in the meantime she talk again with Lieberman and find out the name of the law firm he was representing. The next morning, Mrs. Tavernakis made a tentative appointment to see Lieberman that evening, provided it would be convenient with her husband. During Mrs. Tavernakis' meeting with an investigator for the State Bar in the afternoon, petitioner's secretary telephoned to confirm the appointment for Lieberman to see the Tavernakises that evening.

The State Bar investigator arranged to be there when Lieberman was due to arrive, and he hid himself under the stairs, where he could hear the entire conversation. Lieberman indicated that although he did not remember who it was, he believed it was a former client at the hospital who had notified him of Mrs. Tavernakis' accident. He reiterated his advice that she concentrate her efforts on the second accident, telling her that in this state a person cannot sue the same insurance company for two accidents at the same time. He also again told her that petitioner and

his partner were specialists in personal injury actions and were the best in California. He emphasized that the firm had its own doctors, who knew how to write up medical reports to the best advantage of a claimant. He also described petitioner and his partner as young, aggressive attorneys who really knew their field, and said that he was sure the Tavernakises would like both of them.

Mrs. Tavernakis said she did not want to employ an attorney without having met him. Lieberman said that the attorneys made $1,000 a day in court and could not take up their time "chasing around signing up clients." He offered, however, to arrange for her to talk with petitioner by telephone. He again cautioned her against employing Wasserman, who, he said, could not be very active in the personal injury field, since he (Lieberman) had never heard of him.

In the end, Lieberman became somewhat provoked that he had taken the long trip to her home and that Mrs. Tavernakis had not signed the retainer. He left four business cards and asked her to call him if she decided eventually to employ petitioner's firm. Two of the cards were petitioner's business cards, and the other two were cards bearing Lieberman's name and the name "Fredericks Accident Investigations." The telephone number shown on this card was indicated to be a day or night number. The address was a suite opposite petitioner's office, which suite was used by Lieberman in his work for the firm. Petitioner paid the rent for the suite and also the telephone bills. Lieberman explained that he had intended to go into the accident investigation business on the side and had had the cards made up, but that nothing further had been done in this regard.

■ Petitioner's principal contentions are (1) that the evidence does not support the finding that he knew of Lieberman's actions or the finding that Lieberman's activities were conducted with petitioner's knowledge, acquiescence, or consent or pursuant to an established scheme or design, and (2) that, in the alternative, the degree of discipline recommended by the board was grossly excessive in the light of all the facts and circumstances.

As pointed out by this court on innumerable occasions, the burden is on petitioner to show that the findings of the board are not supported by the evidence or that its recommendation is erroneous and unlawful (see, e.g., *Younger* v. *State Bar,* 12 Cal.3d 274, 284-285 (1) [113 Cal.Rptr. 829,

522 P.2d 5]; *Walter v. State Bar,* 2 Cal.3d 880, 887 (2) [87 Cal.Rptr. 833, 471 P.2d 481]). Petitioner has failed to meet this burden.

Admittedly, petitioner had no contact with the persons allegedly solicited by Lieberman until they appeared at the hearing before the local administrative committee, and there is no evidence that he expressly directed Lieberman to make the solicitations. However, as pointed out by this court in *Zitny* v. *State Bar,* 64 Cal.2d 787, 792 [6] [51 Cal.Rptr. 825, 415 P.2d 521], "The wilfulness or intent may be proved by direct *or by circumstantial evidence.*" (Italics added.) (*Younger* v. *State Bar, supra,* 12 Cal.3d 274, 286; *Abeles* v. *State Bar,* 9 Cal.3d 603, 610 [108 Cal.Rptr. 359, 510 P.2d 719]; *Millsberg* v. *State Bar,* 6 Cal.3d 65, 74 [98 Cal.Rptr. 223, 490 P.2d 543].)

Petitioner's testimony with respect to his instructions to Lieberman is highly significant. When questioned about his attitude regarding calling prospective clients whose names and telephone numbers had been left with someone at his office, petitioner showed that he understood the difference between calling such a person where there was no indication that the person himself had requested that petitioner call and calling such a person where it was clear that the person himself had requested that petitioner call. Nevertheless, with respect to the instructions he had given Lieberman, petitioner testified: "Q. Did you ever inform Mr. Lieberman when you employed him with regard to the limitations that are imposed on attorneys with regard to solicitation of business? A. Yes. Q. Would you tell us what instructions you gave him on that subject and when you first gave him those instructions. A. In general conversation while Fred [Lieberman] was around the office and in talking, I am sure that I made it clear to him that it's against the law for attorneys to go out and solicit business. Q. Did you define to him what solicitation meant? A. Yes. I told him he cannot go over to the scene of an accident where there are people at an accident standing around and go over and hand out my card and say to them, 'Hey, you want an attorney?' Q. Is that the extent of your instructions on that particular issue? A. No, Mr. Seligsohn. It was more extensive than that. Q. Would you please tell the Committee how extensive as to the particular details you gave him. A. I told him that if a friend of his told him that he knew somebody who was in an accident, he could not call that person up and solicit for our firm. Q. Did you give him any further instructions? A. I am sure I did. I told him, and I used the word solicitation and other things, I told him that it's not to be done. Q. In his testimony both today and yesterday I believe I asked him if he understood the distinction between contacting a potential accident

client referred by either another client of the office or an ex-client and contacting or soliciting the victim who originally called the office and requested someone to call him. Did you ever explain to him that it was proper for him to return a call by a potential client who had made inquiry of the firm, but that it was improper for him to call someone merely because an ex-client had left a message with the office to the effect that this person was in an accident and may need a lawyer? Do you understand the distinction I am talking about? A. I understand the distinction. Q. Did you ever so inform Mr. Lieberman that one of those was permissible and proper and is how business is conducted and the other might constitute a solicitation? A. I don't think so."

Lieberman himself, interestingly enough, testified: "Q. Well, did [petitioner] ever advise you of limitations on attorneys with regard to soliciting clients? A. We never discussed soliciting a client . . . . Q. By Mr. Seligsohn: Did he give you any instructions on what practices are not permissible in signing up new clients? A. By The Witness: He never told me what not to do . . . . Q. And did [petitioner] ever give you instructions on how you should hold yourself out or how you should or should not contact such people? A. I only contacted the people that I was told to contact. If they told a friend to tell me to call them, then I would call them or their mother called and told us to call the son, then I called the son. Q. Did [petitioner] ever tell you that certain practices regarding contacting prospective clients were unethical or against the rules of the State Bar? A. We never discussed it."

Lieberman further testified: "Q. Mr. Lieberman, yesterday at the time of the break I asked you whether or not [if] someone, an ex-client of your firm, called your firm and left a message that another person had been in an accident and may need a lawyer . . . you were instructed to call that potential claimant yourself. As I recall, you answered that you were instructed to return all calls; is that correct? A. Yes. My instructions were to return all calls for any attorneys that are out of the office . . . . Q. Did [petitioner] ever advise you or instruct you with regard to any distinction between calling someone who was referred by someone else as to returning the call of the client himself who wished to be retained? A. My instructions were to return all calls. Q. All right. The source of the call was not material to you; is that correct? A. I don't believe that . . . [petitioner] ever distinguished to just call back certain people or not call back other people. He just told me to return calls. Q. In fact, at one time, I believe at the preliminary hearing in this matter, there had been a problem and you had lost a lot of clients by not making punctual returns

of their calls; is that correct? A. Yes. Q. Because of that, were you instructed by [petitioner] to return all calls? A. Yes."

In addition to the foregoing evidence of petitioner's instructions to Lieberman there is also circumstantial evidence that petitioner was aware that solicitations were being made to prospective clients and that he sought to avoid implication of his personal involvement. Thus, Lieberman established a separate office in the same building as petitioner's office, and had business cards printed which read "Fredericks Accidents Investigations—Fred C. Lieberman." However, Lieberman continued to work as petitioner's salaried employee and had no other clients of his investigations business. Both the office rent and charges for a separate telephone were paid by petitioner, and, during Lieberman's absence from his office, his telephone was answered by petitioner's office personnel. Such evidence adds support to the board's finding of petitioner's knowledge.

From the above, it will be seen that there was substantial circumstantial evidence to show that petitioner wilfully violated rules 2 and 3. There is in the record convincing proof to a reasonable certainty that petitioner's employee, Lieberman, solicited professional employment in behalf of petitioner from Miss Warwick, Mrs. Wright, and Mrs. Tavernakis. The local administrative committee, which saw and heard the witnesses, expressly found that Lieberman had solicited Miss Warwick and Mrs. Tavernakis; and in this court's independent review of the evidence the committee's findings are entitled to great weight. (*Lewis v. State Bar,* 9 Cal.3d 704, 712-713 [108 Cal.Rptr. 821, 511 P.2d 1173]; *Ridley* v. *State Bar,* 6 Cal.3d 551, 559 [99 Cal.Rptr. 873, 493 P.2d 105].)[3]

The record shows that at the time Lieberman made the solicitations he was a full-time employee of petitioner's firm and that petitioner saw him with respect to the performance of his duties oftener than once a week.

---

[3]The local administrative committee did not make a specific finding whether Lieberman had solicited from Mrs. Wright, but the notice to show cause had not expressly so charged. After independently reviewing the evidence and hearing oral argument, the board unanimously found that Lieberman had solicited professional employment from Mrs. Wright. This finding is sustained by convincing proof in the record.

Petitioner contends that because of the variance between the charges in the notice to show cause and the board's finding, the latter should be stricken. However, no showing has been made that the variance was prejudicial enough to warrant striking the finding. (See *Linnick* v. *State Bar,* 62 Cal.2d 17, 23 [41 Cal.Rptr. 1, 396 P.2d 33].) Significantly, petitioner proceeded with the hearing as if all the facts surrounding the alleged solicitation of Mrs. Wright were in issue.

Moreover, petitioner knew that Lieberman, although an experienced salesman, had never worked in a law office before and was not knowledgeable with respect to the prohibition against the solicitation of professional employment. Petitioner also knew that before Lieberman was employed full-time he had received only minimal instructions from Mizrahi and that while Lieberman was working part-time petitioner and Mizrahi always told him who the firm's clients were and whom he should contact. However, when the arrangement was made for Lieberman to go on a full-time basis and work out of the Gardena office, petitioner specifically directed him to return *all* calls for any attorney there who was out at the time the call was received. Petitioner knew at the time he gave such directions that the system of recording incoming calls did not indicate who had placed the call. Recognizing that it could be an improper solicitation to call a person who had not requested that he be called, petitioner nevertheless failed to warn Lieberman that he should not call persons who had not so requested. ■■ ■■■■ From the evidence, it is clear that petitioner knew that Lieberman was making telephone calls to prospective clients under circumstances where it was improper to do so.[4]

It is ordered that petitioner be suspended from the practice of law for six months. This order is effective 30 days after the filing of this opinion.

Petitioner's application for a rehearing was denied August 27, 1975.

---

[4]The notice to show cause charged that petitioner "knew or should have known" of his employee's solicitations of prospective clients, and the committee made findings consistent with such charges. Petitioner contends that a finding that he should have known of such improper conduct, in the absence of actual knowledge, is insufficient to warrant discipline for a wilful breach of the rules of professional conduct. (See Bus. & Prof. Code, § 6077.) We agree with petitioner's contention. (See *Ashe* v. *State Bar* (1969) 71 Cal.2d 123, 139 [77 Cal.Rptr. 233, 453 P.2d 737]; *Zitny* v. *State Bar, supra,* 64 Cal.2d 787, 792 [51 Cal.Rptr. 825, 415 P.2d 521]; *Palmquist* v. *State Bar* (1954) 43 Cal.2d 428, 435-436 [274 P.2d 640].) We find as did the board, however, on clear and convincing evidence that petitioner did in fact know that Lieberman was engaged in improper solicitations of prospective clients on behalf of petitioner.