[L.A. Nos. 30666, 30642. Oct. 11, 1977.]

ROBERT L. FITZPATRICK, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

Robert L. Fitzpatrick, in pro. per., for Petitioner.

Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

OPINION

**THE COURT.**\*—This is a proceeding to review recommendations of the Disciplinary Board of the State Bar in L.A. 30642 that petitioner be suspended from the practice of law for five years on conditions of probation, including actual suspension of from two to five years and in L. A. 30666 that petitioner be suspended from practice for three months. The board further recommends in L.A. 30666 that, in the event discipline is imposed in the first action, petitioner be suspended for one year consecutive to any actual suspension imposed in the first action. Although the two disciplinary proceedings were separately argued before the board, we exercise our prerogative to consider the proceedings contemporaneously. (*Silver* v. *State Bar* (1974) 13 Cal.3d 134 [117 Cal.Rptr. 821, 528 P.2d 1157]; *Black* v. *State Bar* (1972) 7 Cal.3d 676 [103 Cal.Rptr. 288, 499 P.2d 968]; *Cutler* v. *State Bar* (1969) 71 Cal.2d 241 [78 Cal.Rptr. 172, 455 P.2d 108].) We have concluded that due to the gravity of petitioner's repeated offenses, petitioner should be disbarred.

Petitioner was admitted to practice in 1965. He was suspended from practice on May 21, 1975, as a result of his conviction of selling,

---

\*Before Tobriner, Acting C. J., Mosk, J., Clark, J., Richardson, J., Sullivan, J.,† and Wright, J.‡

†Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

‡Retired Chief Justice of California sitting under assignment by the Acting Chairperson of the Judicial Council.

furnishing, or giving away cocaine. (Health & Saf. Code, § 11352.) On August 18, 1976, when his judgment of conviction was reversed, we vacated the interim suspension order.

In L.A. 30642, he is charged in three counts with the violation of his oath and duties as an attorney (Bus. & Prof. Code, §§ 6067, 6068, 6103), the willful violation of rule 9 of the Rules of Professional Conduct (present rule 8-101, commingling of client's funds), and the commission of acts involving moral turpitude and dishonesty (Bus. & Prof. Code, § 6106). In L.A. 30666, he is charged with the violation of his oath and duties as an attorney (Bus. & Prof. Code, §§ 6067, 6068, 6103) and the commission of acts involving moral turpitude and dishonesty (Bus. & Prof. Code, § 6106).

The current charges arose from petitioner's conduct in four separate legal matters. For convenience and clarity, the Tibbetts and Green matters will be treated together, while the Baxter and Wilson matters will be treated separately.

*The Tibbetts and Green Matters*

In June 1971 petitioner was retained to defend Larry Tibbetts and Kenneth Green against felony charges brought against them. Petitioner had represented Green in a previous case. Bail for each was set at $6,250. Petitioner advised Charles Green, Kenneth's father, that his son was in jail and that $6,250 was needed for a cash bond,[1] and requested him to send the $6,250 to petitioner's trust account with the Bank of America in Los Angeles. Petitioner also contacted Tibbetts' mother and advised her that $6,250 was needed as bail to get her son out of jail. Mrs. Tibbetts understood that this sum was for cash bail which would be returned. Pursuant to petitioner's instructions, Mrs. Tibbetts wired the $6,250 to petitioner's trust account in Los Angeles.

Petitioner used no portion of the $12,500 paid to him by his clients' parents for cash bail. Rather, on the days he spoke to each of the parents, petitioner arranged to have Tibbetts and Green released from custody on $6,250 bail bonds furnished by a bail bond agency. Petitioner paid the $625 premium on each bail bond.

---

[1]According to the testimony of a bail bondsman, when cash is used as bail, a bonding company is not used, and the full deposit is returned if bail is exonerated.

Petitioner admitted that he withdrew the $12,500 from his trust account since he did not regard the sum as trust money, thereby causing his trust account balance to drop to $23. Petitioner testified that he informed Mrs. Tibbetts and Mr. Green that he would never allow his clients to post cash bond, for, if cash bond is posted, the judge is likely to impose the amount of cash bail as the fine in the event of conviction. Rather, petitioner regarded Tibbetts' payment as "collateral" for the bail bond on her son and allegedly removed the money from his trust account over a period of several weeks and placed it in his safe. Petitioner could not explain why he removed the money over a period of weeks rather than removing it at once. Petitioner claims that Charles Green authorized him to apply the $6,250 which Green provided toward current and previous legal fees incurred by Kenneth Green; Charles Green denied that any such agreement existed.

Some time after their release, Tibbetts and Green learned that commercial bail bonds rather than cash bonds had been used. When they told petitioner to substitute the cash for the bail bonds, petitioner advised them that the substitution would require that they be rebooked. Green and Tibbetts then suggested that the cash be placed in a savings and loan association to draw interest, but petitioner never followed their instruction.

In November 1971, when petitioner realized there was a conflict of interest between Green and Tibbetts, he substituted out as counsel for Tibbetts. Ludwig Gerber, with whom petitioner shared office space, became counsel for Tibbetts. Tibbetts "reluctantly" agreed that $2,000 of the $6,250 sent to petitioner by his mother for bail could be paid to Mr. Gerber for his services in the criminal matter.[2]

Although the bonds were exonerated in May 1972, petitioner did not return the $12,500 to his clients' parents at that time. Tibbetts testified that from May to August 1972, he repeatedly requested the return of the $4,250 still owed his mother. On three occasions, petitioner falsely told Tibbetts he had sent the money to Mrs. Tibbetts. When Tibbetts

---

[2]Tibbetts testified that no fee was mentioned to Tibbetts by Mr. Gerber until 15 minutes before the last court hearing. Gerber then told Tibbetts to sign a note agreeing to pay Gerber $2,500 out of the $6,250 cash petitioner was holding, or Gerber would leave. When Tibbetts replied that $2,500 was a "lot of money," Gerber walked off. Tibbetts, who was in the courtroom when this took place, asked Gerber to come back, as Tibbetts had to have a lawyer. Gerber then told Tibbetts that he would take $2,000 as his fee, and Tibbetts signed the note authorizing petitioner to pay Gerber $2,000 out of the $6,250 which his mother had sent for bail.

discovered the money had not been sent, petitioner gave various excuses. In July 1972, Tibbetts filed a complaint against petitioner at the State Bar.

On August 8, 1972, after being advised by the State Bar of the complaint against him, petitioner paid Mrs. Tibbetts the $4,250. Petitioner explained the delay in sending Mrs. Tibbetts her money by asserting that Larry Tibbetts wanted the money for himself, that petitioner had explained to Tibbetts that he could not give him the money without a letter of authorization from Mrs. Tibbetts, and that the letter was never received. Since petitioner contends that Charles Green orally authorized him to use the $6,250 as partial payment of legal fees incurred by his son, petitioner has made no attempt to return any of this amount to Green.

In the Tibbetts and Green matters both the local committee and the board concluded that petitioner was guilty of commingling and misappropriating by withdrawing funds received in trust from Mrs. Tibbetts and Charles Green to be used in connection with obtaining the release of their sons on bail, and treating these funds as his own.

■ Petitioner challenges the committee's finding that Charles Green never authorized petitioner to apply any portion of the $6,250 toward legal fees incurred by his son. Since the only evidence supporting a finding that an agreement existed between petitioner and Mr. Green is petitioner's own testimony, petitioner's credibility as a witness is in issue, and we must give great weight to the finding of the administrative committee which saw and heard the witnesses. (*Selznick* v. *State Bar* (1976) 16 Cal.3d 704, 708 [129 Cal.Rptr. 108, 547 P.2d 1388]; *Ridley* v. *State Bar* (1972) 6 Cal.3d 551, 559 [99 Cal.Rptr. 873, 493 P.2d 105]; *Corn* v. *State Bar* (1968) 68 Cal.2d 461, 466-467 [67 Cal.Rptr. 401, 439 P.2d 313].) The record adequately supports the committee's finding that Charles Green never authorized petitioner to apply the bail money toward legal fees.

■ Prior to the board hearing, Mr. Howard, a member of the board, disqualified himself at petitioner's request, since Mr. Howard had been with the Los Angeles District Attorney's office which prosecuted petitioner for a felony in 1975. Petitioner alleges that although Mr. Howard did not participate in the action of the board, his return to the meeting prior to the discussion by the board had a highly prejudicial effect on the board.

In *Burns* v. *State Bar* (1955) 45 Cal.2d 296, 303 [288 P.2d 514], we expressed doubt over whether disqualification of a member of the Board of Governors would justify setting aside a disciplinary proceeding. (*Fish* v. *State Bar* (1931) 214 Cal. 215, 225 [4 P.2d 937].) In any event, disqualification of a member of the Board of Governors would not invalidate the prior proceedings before the local committee; in cases in which a disqualified member of the board votes to impose discipline on an attorney, the most the attorney could claim would be a remand to the board for a new recommendation by qualified members. (*Geibel* v. *State Bar* (1939) 14 Cal.2d 144, 147 [93 P.2d 97]; *Burns* v. *State Bar, supra,* 45 Cal.2d 296, 303.)

In the present case, Mr. Howard, the disqualified member of the board, did not vote or participate in the proceedings of the board in any way. The fact that petitioner assumes prejudice from Howard's presence is not sufficient to sustain his contention, since petitioner does not show actual prejudice. (*Farnham* v. *State Bar* (1976) 17 Cal.3d 605, 609 [131 Cal.Rptr. 661, 552 P.2d 445]; *Yokozeki* v. *State Bar* (1974) 11 Cal.3d 436, 449 [113 Cal.Rptr. 602, 521 P.2d 858].)

■ ■ The burden of demonstrating that the board's findings are unsupported by the evidence rests upon petitioner (*Geffen* v. *State Bar* (1975) 14 Cal.3d 843, 852 [122 Cal.Rptr. 865, 537 P.2d 1225]); although petitioner claims the board's findings that he commingled and misappropriated clients' funds finds no support in the evidence, the preceding statement of facts clearly demonstrates ample support for the findings. Because the findings are adequately supported by the record, they should be adopted by this court. (*Geffen* v. *State Bar, supra,* 14 Cal.3d 843.)

*The Baxter Matter*

Warren Baxter retained petitioner to assist him in resolving a dispute with Venice Van and Storage Company over the amount due Venice for its services. Venice had demanded more than the $130 Baxter believed it was due.

Baxter's mother provided petitioner with a check for $130 payable to "Venice Van and Storage Company c/o Attorney Robert Fitzpatrick" to be held "in escrow." Baxter instructed petitioner to offer Venice $130 in settlement of the dispute, and paid him a $50 fee in two $25 installments.

The $130 check was deposited in petitioner's trust account, apparently without his knowledge even though he admits having endorsed the check. Someone in petitioner's office also endorsed the check with a signature reading "Venice Van and Storage Co." Within a month after deposit of the check petitioner's trust account was overdrawn and closed.

Petitioner took no action on Baxter's behalf. Although petitioner claimed to have telephoned Venice and to have tendered $130 in settlement, Venice told Baxter it had never heard from petitioner, and petitioner provided no documentary proof of the alleged attempted tender. Petitioner repeatedly failed to return Baxter's calls inquiring about the status of the settlement negotiations.

In August 1973, Baxter contacted the sheriff's office in regard to the two signature endorsements on his mother's $130 cashier's check and filed a complaint with the State Bar against petitioner. In October 1973, after learning about Baxter's complaint against him, petitioner sent Baxter a check for $130 drawn on one of his trust accounts, payable to Venice. In a letter accompanying the check, petitioner promised to refund $25 of the $50 fee, and did make the refund.

The local committee and the board found petitioner guilty of commingling and misappropriating trust funds by permitting the forging of the endorsement of Venice Van and Storage on a check delivered to him for use in settlement negotiations by depositing the check into his trust account, and thereafter by using those funds for other purposes.

Petitioner concedes that the direction by Mrs. Baxter to hold the $130 in escrow did not permit his employees to deposit the check into his trust account, particularly since the check was payable to petitioner and Venice Van and Storage. Petitioner's contention that the deposit was made without his knowledge or authority is without merit, however, since petitioner must accept the responsibility of supervising the work of his staff. (*Vaughn* v. *State Bar* (1972) 6 Cal.3d 847, 857 [100 Cal.Rptr. 713, 494 P.2d 1257].) Thus, petitioner has failed to meet his burden of showing that the findings of the board are not supported by the evidence.

*The Wilson Matter*

Petitioner represented Daniel Wilson in certain criminal proceedings in which Wilson was found guilty of possession of marijuana for sale. Wilson's mother retained petitioner to file the appeal of her son's case.

Petitioner informed her that his fee would be $2,000. Between November 1972 and April 1973, Mrs. Wilson paid petitioner $2,000 for the appeal.

Prior to petitioner becoming attorney of record, Wilson's pro. per. appeal was dismissed for failure to file an appellant's opening brief. Petitioner visited Wilson briefly in jail once and presented a paper not further described for his signature in connection with the appeal. Upon becoming attorney of record in March 1973, petitioner filed a motion to vacate the order of dismissal and reinstate the appeal, which was granted. Petitioner was also granted an extension of time to April 27, 1973, to file the opening brief. Petitioner never filed an opening brief, however, and in December 1973, the Court of Appeal dismissed Wilson's appeal on the ground that no such brief had been filed and that more than 30 days had elapsed since notification pursuant to rule 17(a), California Rules of Court.

After Wilson was released from custody on probation in April 1973, he called petitioner's office several times over a period of two or three months and left a phone number where he could be reached; petitioner never returned any of these calls. Thus, after his meeting with petitioner in jail, Wilson had no further contact with petitioner.

After retaining petitioner in late 1972, Mrs. Wilson's communications with him were minimal. Petitioner failed to return some of her calls, and when she was able to reach him, petitioner indicated that he had filed "the papers" and was waiting for a court date. On October 13, 1973, the Court of Appeal informed Mrs. Wilson that it had no record of any filing. The final date for filing the brief had long since passed. Later in the month she retained Dean Hyatt, another attorney to recover the $2,000 she had paid petitioner for her son's appeal.[3]

Hyatt wrote to petitioner on October 26, 1973, demanding that petitioner return at once the $2,000 fee advanced petitioner by Mrs. Wilson. He instructed petitioner to discontinue further efforts on the appeal to prevent petitioner from doing any further work to justify the fee. Petitioner did not respond to the letter.

---

[3]Mrs. Wilson brought a newspaper article to Hyatt's office which told about petitioner's arrest for a felony charge. The article caused her concern about petitioner's ability to handle the case.

On the basis of the above evidence, the board adopted the local committee's findings and concluded that petitioner willfully failed and refused to perform the services for which he was retained by Mrs. Wilson, violating his oath and duties as an attorney. (Bus. & Prof. Code, § 6067.)

■ Petitioner gives three explanations for his failure to file a brief. First, he contends that his agreement with Mrs. Wilson provided that he would file the brief after he was paid $2,650, $2,000 for the appeal and $650 owed by Wilson for prior legal services.[4] The allegation is supported almost exclusively by his own testimony; no bill for the $650 was introduced into evidence. A letter dated April 17, 1973, from petitioner to Mrs. Wilson does support petitioner's position. In the letter he acknowledged receipt of Mrs. Wilson's final $250 payment for the appeal, but indicated that he would not proceed until the monies were received in full "as per the agreement."[5]

Although rule 2-111(C)(1)(f) of the California Rules of Professional Conduct states that a lawyer may withdraw from employment if the client deliberately disregards an agreement or obligation concerning attorney's fees and expenses, in the instant case petitioner did not seek permission to withdraw. According to Mrs. Wilson's testimony, in August 1973, a few months after the mailing of the above letter, petitioner told Mrs. Wilson that he had filed "the papers" and was waiting for a court date. Even if the alleged agreement existed, petitioner's conduct in becoming attorney of record and failing to take any further action cannot be condoned.

■ Second, petitioner asserted that he did not file the brief for Wilson because he did not have the transcripts on appeal. The Court of Appeal informed him that it had sent the transcripts to Wilson while he was acting in propria persona; Wilson, however, told petitioner that he

---

[4]It is undisputed that Daniel Wilson owed petitioner at least $500 for former legal services. Daniel Wilson testified that he was contacted by a collection agency seeking to collect that sum.

[5]The letter states in part: "I am disappointed, however, that it is taking so long to get paid the retainer and to clear up Danny's indebtedness. As I told you back in October or November of last year, because of our problems in getting paid for the last two cases, we cannot proceed until the monies are received in full. Time marches on in the appeal, and the only reason I substituted in as attorney of record was to make the motion to vacate the order of dismissal. It is against my better judgment, and I am unwilling to proceed until we are paid in full as per our agreement. If there is a problem, it would be better for Dan to request an attorney be appointed for him. We will then deduct the monies owed us for his previous cases, and refund the balance to you."

had never received anything. Petitioner unsuccessfully attempted to obtain the transcripts from the Attorney General's office; he made no further attempt to obtain the transcripts because he felt that even if the remittitur had issued, following a notice under rule 17(a),[6] there would still be a valid ground to reinstate the appeal on the basis that no transcripts had been received.[7] Petitioner offers no explanation for his failure to seek an extension of time to file the brief.

Since the rule 17(a) notice was mailed on September 12, 1973, Hyatt's instructions to take no further action on the appeal does not explain petitioner's failure to file the brief or obtain necessary extensions of time over the six months preceding Hyatt's instruction of October 26, 1973.

■ Finally, petitioner contends he was precluded from cross-examining certain witnesses, because the chairman erroneously sustained objections to certain questions propounded by petitioner on recross-examination. The contention is meritless, as the record clearly demonstrates petitioner's questions were either repetitive and beyond the scope of the redirect examination, irrelevant, or argumentative. (See Witkin, Cal. Evidence (2d ed. 1966) §§ 302, 1158, 1159.)

*Discipline*

In the Green, Tibbetts and Baxter matters, upon finding that petitioner commingled and misappropriated trust funds, the board recommended by a vote of nine to five[8] that petitioner be suspended from the practice of law for five years on conditions of probation,

---

[6]Rule 17(a) provides: "If the appellant's opening brief is not filed within the time prescribed in subdivision (a) of rule 16, the clerk of the reviewing court shall notify the parties by mail that if the brief is not filed within 30 days after the date of mailing of the notification, the appeal will be dismissed, unless good cause is shown for relief. If a sufficient written showing of excuse is made within such 30-day period, the Chief Justice or Presiding Justice may grant additional time to file the brief subject to such conditions as he may deem proper to impose; otherwise the appeal may be dismissed forthwith. [¶] If the brief is not filed within the time granted by the Chief Justice or Presiding Justice, the appeal may be dismissed forthwith. . . ."

The Court of Appeal file reflects that a rule 17(a) notice was sent on September 12, 1973, but the file does not show to whom the notice was sent. The notice is customarily sent to the attorney of record, who was petitioner; petitioner claims that he never received the notice.

[7]In *Lundy* v. *Lakin* (1949) 89 Cal.App.2d 849 [202 P.2d 369], the court granted appellants' motion to reinstate the appeal upon a showing of good cause.

[8]Of the five board members voting "no," four thought the amount of actual suspension recommended to be excessive, and one thought petitioner should be disbarred. A disqualified member of the board did not vote.

including actual suspension of from two to five years. In L.A. 30666 (the Wilson matter), upon finding that petitioner willfully failed and refused to perform the services for which he was retained by Mrs. Wilson, the committee recommended that petitioner be disciplined by private reproval and ordered to make restitution to Mrs. Wilson in the sum of $2,000. The board unanimously recommended that petitioner be suspended from the practice of law for three months, but the board recommended that in the event discipline is imposed in L.A. 30642, petitioner be suspended for one year, which period of suspension should be consecutive to any actual suspension imposed by the court in L.A. 30666.

■ Petitioner urges that because the local committee heard the evidence, their recommendation of a 30-day suspension should have been given greater weight by the board. Although the committee's *factual* findings are entitled to greater weight, the board's recommendations of discipline are to be accorded greater weight than those of the local committee. (*Toll* v. *State Bar* (1974) 12 Cal.3d 824, 831 [117 Cal.Rptr. 427, 528 P.2d 35].) In addition, this court may impose more severe discipline when it is warranted, as in this case. (*Greenbaum* v. *State Bar* (1976) 15 Cal.3d 893, 904 [126 Cal.Rptr. 785, 544 P.2d 921]; *Silver* v. *State Bar, supra,* 13 Cal.3d 134, 147.)

■ The extent of the discipline imposed is determined from a " 'balanced consideration of the relevant factors.' " (*Greenbaum* v. *State Bar, supra,* 15 Cal.3d 893, 904.) ■ Misappropriation of a client's property is a gross violation of general morality likely to undermine public confidence in the legal profession and therefore merits severe punishment. (*Yokozeki* v. *State Bar, supra,* 11 Cal.3d 436, 450.) This court has repeatedly stated that misappropriation of trust funds may warrant disbarment. (*Wells* v. *State Bar* (1975) 15 Cal.3d 367, 371 [124 Cal.Rptr. 218, 540 P.2d 58]; *Sevin* v. *State Bar* (1973) 8 Cal.3d 641, 646 [105 Cal.Rptr. 513, 504 P.2d 449].) Petitioner's commingling of trust funds by itself could warrant up to three years of actual suspension. (Bus. & Prof. Code, § 6077; *Wells* v. *State Bar, supra,* 15 Cal.3d 367, 371.)

■ The record also shows that petitioner was guilty of making statements to his clients concerning their lawsuits, which he knew to be

false. Such dishonest conduct falls within the prohibition of Business and Professions Code section 6106. (*Stephens* v. *State Bar* (1942) 19 Cal.2d 580, 583 [122 P.2d 549]; cf. *Wallis* v. *State Bar* (1942) 21 Cal.2d 322 [131 P.2d 531].)

Petitioner appears unrepentant and continues to maintain that the complaints filed by Green and Tibbetts were malicious and made for the purpose of satisfying their personal grudges against petitioner and to profit at petitioner's expense.[9] Furthermore, petitioner made partial restitution to Mrs. Tibbetts and restitution to Mr. Baxter only under the pressure of a forthcoming State Bar disciplinary investigation; thus, the restitution is entitled to no weight as a mitigating circumstance. (*Sevin* v. *State Bar, supra,* 8 Cal.3d 641, 646.) At this time petitioner still maintains he is authorized to apply Mr. Green's trust funds towards legal fees owing him by Mr. Green's son, and has made no offer of repayment.[10]

Under all the circumstances, the board's recommendation that petitioner be suspended from the practice of law for five years on conditions of probation, including two years' actual suspension was lenient. We have concluded petitioner should be disbarred. In addition, we recommend to the State Bar that it consider the advisability of requiring that petitioner make restitution in the sum of $2,000 to Mrs. Tibbetts,[11] $6,250 to Charles Green, and $2,000 to Mrs. Wilson before petitioner be reinstated to the Bar, assuming that he is otherwise qualified for reinstatement.

---

[9] We recently stated in *Sodikoff* v. *State Bar* (1975) 14 Cal.3d 422, 431 [121 Cal.Rptr. 467, 535 P.2d 311]: "Although we scrutinize with care any evidence bearing 'the earmarks of private spite' [citation], it is nevertheless settled that 'Whatever may have been the instigating factor, or whatever may have been the personal motive, in the initiation of the State Bar proceeding, are not matters of controlling concern in a case where the facts disclosed independently lead to the conclusion that the attorney is subject to some disciplinary action.' [Citations.]" (See also *Greenbaum* v. *State Bar, supra,* 15 Cal.3d 893, 904.)

[10] Petitioner questions the recommendation that he make restitution to Charles Green of $6,250 since the statute of limitations has passed, and he can no longer sue Kenneth Green to collect his fees. Petitioner's argument is frivolous in light of the board's finding, which is amply supported by the record, that Charles Green never authorized petitioner to apply the $6,250 toward unpaid legal fees.

[11] Petitioner contends that he should not be ordered to refund $2,000 to Mrs. Tibbetts since Larry Tibbetts authorized petitioner to pay that sum to Mr. Gerber who shares office space with petitioner and successfully represented Tibbetts. The record reveals that Larry Tibbetts authorized the payment to Gerber "involuntarily." Moreover, the $2,000 payment was never authorized by Mrs. Tibbetts who sent the money as bail to get her son out of jail.

Petitioner is hereby disbarred on the effective date of this order. Petitioner is further ordered to comply with rule 955 of the California Rules of Court and to comply with subdivisions (a) and (c) of that rule within 30 and 40 days respectively after the effective date of this order.

Petitioner's application for a rehearing was denied November 10, 1977.